765 So.2d 816 (2000)
Christopher Jon CLUGSTON, Appellant,
v.
STATE of Florida, Appellee.
No. 4D98-0244.
District Court of Appeal of Florida, Fourth District.
August 9, 2000.
Rehearing Denied September 21, 2000.
Kenneth J. Kukec of Kenneth J. Kukec, P.A., Miami, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Consuelo Maingot, Assistant Attorney General, Fort Lauderdale, for appellee.
PER CURIAM.
Appellant appeals from a final order denying his motion for post-conviction relief, filed pursuant to Florida Rule of Criminal Procedure 3.850. We reverse the final order and remand this case for a new trial.
Appellant was originally indicted for premeditated murder in the drive-by shooting death of Bryce Waldman at about 3:30 in the morning on October 25, 1982, as Waldman was getting off work as a security guard at the Agora Ballroom, at closing time. The state's principal witness, Jessie Ziegenhagen, testified that earlier in the evening, he, Ted Menut, Ted's wife, and Ted's sister had been drinking at the Agora; the women were asked to leave because they were too intoxicated; and due to a minor injury Ted's wife received in the process of being escorted outside, Ted threatened he would return and blow the bouncers' heads off. The group went to Ted's house. Ted later left in his wife's green station wagon, and returned with *817 appellant in appellant's truck, and appellant told him that Ted drove up to the Agora and appellant stuck a gun out the window and began shooting.
Cheryle Lewis, the cocktail waitress who served the group and who, along with a large group of employees getting off work, was standing outside the Agora with Waldman when he was shot, positively identified Ted as the driver of the car, which she described as a greenish-brown station wagon, and initially told the police that the passenger who did the shooting was Ziegenhagen; she also gave a description of the shooter from which a composite drawing was prepared that resembled Ziegenhagen and did not resemble appellant. Lewis was unable to pick appellant out of `a line-up and did not recognize him as anyone she had seen before. At trial, however, she testified that Ziegenhagen was not the passenger who did the shooting.
None of the other numerous witnesses to the shooting was able to identify the two men in the car. Ziegenhagen initially was also indicted for this murder, but charges were dropped in exchange for his testimony. The testimony offered by other state witnesses at trial was contradictory and no physical evidence connected appellant to the crime, but he was convicted nonetheless. The composite drawing was not made available to the defense until many years after the trial.
Over ten years later, this crime story was featured on an NBC news program. Photographs of both appellant and Ziegenhagen were featured. Mary Kathleen Paolillo, who watched the program, was at the Agora when the shooting occurred. Her husband played in the band that was entertaining there that night. Just prior to the shooting, she and a friend were returning from a parking lot across an alley from the Agora when a brown station wagon, driving erratically, almost ran her and her friend over. The passenger stuck his head out the window when the car was about six feet from her and she looked at him face to face for about ten seconds. She later explained that she took particular notice of his face and hair because of her training as a hairdresser. The station wagon then drove out of her sight. Moments later, Paolillo entered the ballroom from the back, and the bouncers told her that there was a shooting going on out front, involving what witnesses perceived to be a brown station wagon. The car the witnesses in front of the building saw, from which the shots were fired, came from the general direction of where Paolillo had been standing, and she realized that she had seen the shooter moments before the shooting. She asked the manager whether she should tell the police what she had seen but was told that enough witnesses out front had seen the actual shooting and she was not permitted to go out front during the initial investigation. She did not tell anyone else at the Agora what she had seen and was never questioned by the police, the state attorney's office, or any private attorney's office about what she had seen. However, when she saw the photographs of appellant and Ziegenhagen on television years later, she recognized Ziegenhagen as the shooter, not appellant, and came forward.
Based in part on Paolillo's statement, the governor and four members of the clemency board granted appellant a conditional commutation of sentence, requiring him to be supervised by a probation officer in Maryland, where appellant's parents lived. Appellant's period of supervision expired around July 1997.
Based on this new evidence, appellant filed this rule 3.850 motion in the trial court. At the evidentiary hearing that followed, it was shown that Paolillo's name was not in any of the discovery documents provided to appellant's counsel before trial. Paolillo testified that she observed the shooting and, having seen appellant's picture on television, she was certain he was not the shooter. She testified that she recognized the photograph of Ziegenhagen shown on the program as the person who shot the victim.
*818 Appellant's trial counsel had died prior to the evidentiary hearing, but his law partner at the time and the attorney who then was a law clerk assisting him with the case both testified to trial counsel's diligence in investigating the case, and the record reflected that trial counsel had received discovery from the state and deposed everyone whose name appeared and everyone those persons mentioned, and no one had even mentioned Paolillo's name. Appellant's counsel at the evidentiary hearing argued that the exercise of due diligence would not have led to the discovery of Paolillo.
The state argued below that Paolillo's existence could have been discovered by investigating the scene after the incident, as she was often present in the same area on the same weekend night over the next five years and made no effort to secrete herself.
The court denied the motion. It concluded that counsel could have known of the evidence through diligent investigation and that the evidence probably would not produce an acquittal on retrial. This appeal followed.
As appellant points out, there is no dispute concerning whether the alleged newly discovered evidence is new or unknown at the time of trial; the only dispute concerns whether it could have been discovered by counsel's exercise of due diligence. Newly discovered evidence is excepted from the two-year time limit of rule 3.850(b). See Fla. R.Crim. P. 3.850(b)(1) ("the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence"). In Jones v. State, 591 So.2d 911, 915 (Fla.1991), the court held that "in order to provide relief, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Thus, the showing appellant was required to make, as the trial court stated at the instant hearing, was as pronounced by the supreme court in Torres-Arboleda v. Dugger, 636 So.2d 1321, 1324-25 (Fla. 1994):
Two requirements must be met in order to set aside a conviction or sentence because of newly discovered evidence. First, the asserted facts "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence." Hallman v. State, 371 So.2d 482 (Fla.1979), abrogated on other grounds, Jones v. State, 591 So.2d 911 (Fla.1991). Second, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Jones, 591 So.2d at 915.
We conclude that the trial court abused its discretion in concluding that appellant's showing fell short of meeting the due diligence prong. Appellant showed that counsel had received discovery from the state and deposed everyone whose name appeared and everyone those persons mentioned. An investigator might have gone to the scene and made numerous inquiries and still not learned that Paolillo had a clear view of the passenger in a car that erratically drove up moments before the passenger in just such a car opened fire. With numerous witnesses to the shooting available to be interviewed, it is too much to expect that counsel would also have thought to inquire whether anyone else might have seen the shooter from another location.
We also conclude the court erred that Paolillo's testimony did not meet the "likelihood of acquittal" test. The only testimony offered by one witness to the shooting regarding appellant's appearance was contradicted by all the other witnesses who testified to what appellant looked like at the time, including Ziegenhagen. Paolillo's testimony went directly to that issue: she was certain it was Ziegenhagen, and not appellant. There is no reason why Paolillo's testimony would not be admissible, *819 and no indication that the trial court found her testimony to be other than credible. As no physical evidence connected appellant with the crime, and given the weakness of the state's case, we believe Paolillo's testimony would probably result in an acquittal on retrial. As a result, we hold the trial court abused its discretion in concluding otherwise.
For the foregoing reasons, we reverse and remand for a new trial.
REVERSED and REMANDED.
POLEN and GROSS, JJ., concur. STONE, J., dissents with opinion.
STONE, J., dissenting.
I would affirm. In my judgment, on this record, the trial court's findings and conclusions do not constitute an abuse of discretion.